IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| J.M.H., *by his father, John Hahn*, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-15 (RDA/IDD) |
| ) | |
| PRINCE WILLIAM COUNTY ) | |
| SCHOOL BOARD, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendants Prince William County School Board ("PWCSB" or the "School Board") and Katharine O'Shea's Motion to Dismiss (Dkt. 20) (the "Motion"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering the Complaint (Dkt. 6),[1] Defendants PWCSB and O'Shea's Memorandum in Support (Dkt. 21), Plaintiff's Opposition (Dkt. 24),[2] and Defendants PWCSB and O'Shea's Reply (Dkt. 25), this Court grants the Motion for the reasons that follow.

---

[1] For reasons that are unknown to the Court, the Complaint appears as docket entry 6, rather than the docket entry 1.

[2] Plaintiff filed two Oppositions to the Motion. Dkts. 23, 24. The only difference between the two Oppositions appears to be the addition of "not" on page 10 of Dkt. 24. Accordingly, the Court cites only to Dkt. 24.

1

I. BACKGROUND

A. Factual Background[3]

This action arises out of an assault which Plaintiff J.M.H. suffered at the hands of fellow students at Patriot High School in Prince William County, Virginia, on December 6, 2023. Dkt. 6 ¶¶ 8, 24. Specifically, Plaintiff alleges that PWCSB authorized the installation of six EVOLV Weapons Detection Systems ("EVOLV systems") at the entrances to Patriot High School for the 2023-2024 school year. *Id.* ¶ 12. On May 3, 2023, the School Board voted to approve a four-year lease of the EVOLV system to be implemented in all middle and high schools. *Id.* ¶ 13. All persons entering those schools would be required to go through the EVOLV system. *Id.* The School Board's vote to approve funding and installation of the EVOLV system in Prince William County Schools was predicated in part on its commitment to form an "Implementation Committee" with representatives for all stakeholders. *Id.* ¶ 14. According to an April 19, 2023 presentation to the School Board, the "Implementation Committee" would: 1) develop comprehensive communication, training, and implementation plans with consideration of timing, logistics, employee usage, school supplies, and traffic flows; and 2) develop policies and regulations for the use of weapons detection systems to screen students upon entry into school buildings. *Id.* ¶ 15.

Plaintiff alleges that, as of the date of the filing of the Complaint, the School Board had not formed such an "Implementation Committee." *Id.* ¶ 16. Plaintiff alleges that, in the absence of an Implementation Committee, the School Board does not have policies or regulations in place to address complaints about the EVOLV system and that this resulted in a failure to address complaints that the implementation of the EVOLV system at Patriot High School presented a risk

---

[3] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

to student safety. *Id.* ¶¶ 17-18. Other than the emails discussed below, Plaintiff does not allege that any additional complaints would have been made.

On November 2, 2023, Dr. Michael Bishop, Principal of Patriot High School, emailed Greg Hood, Associate Superintendent for High Schools, to express his concerns about having to implement the EVOLV system with "very little personnel." *Id.* ¶ 19. In another email to Associate Superintendent Hood dated November 13, 2023, Principal Bishop repeated his specific concern about the lack of personnel in the school building necessary both to operate the EVOLV system and to address incidents within the building. *Id.* ¶ 20. Principal Bishop stated, "Still the same thing we talked about earlier—if staff are absent or there is an issue inside of the building that station cannot be manned or staffed effectively. I had trouble filling my spots up until the day before we went live. Still an issue." *Id.* The School Board took no action in response to Principal Bishop's specific concerns regarding the risk to student safety without adequate personnel. *Id.* ¶ 22.

On December 6, 2025, before arriving at Patriot High School, Student A discussed his plan to confront Plaintiff J.M.H. with Students B and C. *Id.* ¶¶ 25-26. Students B and C agreed to act as backup for Student A when Student A confronted Plaintiff. *Id.* ¶ 27. Student A's father learned of the students' plan to confront Plaintiff and called Patriot High School to alert staff that these students intended to engage in a physical altercation with another student that morning. *Id.* ¶ 28. At approximately 7:04 a.m., a Patriot High School staff member notified Defendant Robert Murphy, a security specialist, that a parent had called to report a concern that his son intended to confront another student and could engage in a physical altercation. *Id.* ¶ 29. Defendant Murphy responded that he would find the student after the first class started since all the students were entering the building at that time through the EVOLV systems. *Id.* ¶ 30.

3

During the 2023-2024 school year, Patriot High School required all students arriving at school to go directly to an assigned common area to wait for a bell notifying them to go to their first class due to the time required to get all students through the EVOLV systems. *Id.* ¶ 32. In the 2023-2024 school year, Patriot High School had an enrollment of approximately 2,200 students, which meant there were hundreds of students assigned to each common area prior to the start of school. *Id.* ¶ 33. Plaintiff was assigned to Commons 1. *Id.* ¶ 34.

Before the bell for the first class, Plaintiff was sitting in Commons 1 at a table, socializing with other students. *Id.* ¶ 35. At approximately 7:16:20 a.m., Students A, B, and C entered Commons 1, and Student B pointed to the corner where Plaintiff was sitting. *Id.* ¶ 36. At approximately 7:16:40 a.m., Student A, with Students B and C behind him, approached Plaintiff. *Id.* ¶ 37. Student A confronted Plaintiff about an alleged verbal exchange between Plaintiff and Student A's sister the previous day in gym class. *Id.* ¶ 38. Then, Student A punched Plaintiff in the face. *Id.* ¶ 39. Plaintiff fought back against Student A. *Id.* ¶ 40. Other students noticed the commotion and immediately a crowd of students formed to watch the fight. *Id.* ¶ 41.

At approximately 7:17:30 a.m., Assistant Principal Emily Utter radioed that she needed security in Commons 1. *Id.* ¶ 42. At approximately 7:17:40 a.m., Plaintiff stood up from where he had been fighting with Student A and attempted to walk away. *Id.* ¶ 43. Students B and C rushed up behind him. *Id.* Student C punched Plaintiff in the back of the neck while he and Student B pushed Plaintiff into the hallway. *Id.* Students B and C continued to punch Plaintiff in the head and torso as they pushed him into an adjacent hallway. *Id.* ¶ 44. Student C slammed Plaintiff to the ground causing Plaintiff to hit his head on the ground. *Id.* Plaintiff was unconscious as he laid face down and arms out on the ground. *Id.* ¶ 45. Students B and C continued to kick and punch Plaintiff in the head, shoulder, and torso while he laid face down and unconscious on

4

the ground. *Id.* ¶ 46. Video footage of the attack captured audio of someone yelling, "Die white boy" and "Kill that white boy." *Id.* ¶ 47. Other students intervened to stop the attack and move the crowd away from Plaintiff as he lay face down and motionless on the floor. *Id.* ¶ 48. School security cameras and witnesses captured videos of the attack from multiple angles. *Id.* ¶ 49.

At approximately 7:18 a.m., Defendant Murphy and other staff members arrived on the scene and attempted to get through the crowd of students to where Plaintiff was on the floor. *Id.* ¶ 50. Defendant Murphy observed Plaintiff lying on the floor prior to reaching him. *Id.* ¶ 51. At approximately 7:18:25 a.m., Defendant Murphy knelt down by Plaintiff and helped Plaintiff stand up. *Id.* ¶ 52. Defendant Murphy did not call 9-1-1. *Id.* ¶ 53. At approximately 7:19 a.m., Defendant Murphy escorted Plaintiff to an empty classroom near where the attack ended in the hallway. *Id.* ¶ 54.

Officer Michael Fink, a School Resource Officer with the Prince William County Police Department, also responded to the scene. *Id.* ¶ 55. Officer Fink called Defendant Katharine O'Shea, a nurse at the school, and asked that she come to the classroom to evaluate Plaintiff. *Id.* ¶ 55. Nurse O'Shea arrived and decided to bring Plaintiff to her office to check for a possible concussion. *Id.* Officer Fink and Nurse O'Shea escorted Plaintiff to Nurse O'Shea's office. *Id.* ¶ 56. Officer Fink asked Plaintiff and Nurse O'Shea if he should call for an ambulance. *Id.* ¶ 57. Plaintiff declined the offer of an ambulance. *Id.* Nurse O'Shea did not respond to Officer Fink about calling an ambulance and did not instruct any person to call an ambulance for Plaintiff. *Id.* ¶ 58. Officer Fink asked Plaintiff what happened. *Id.* ¶ 59. Plaintiff explained to Officer Fink and Nurse O'Shea what he remembered prior to Students B and C getting involved. *Id.* Officer Fink reported that Plaintiff said he did not remember everything that happened to him. *Id.*

5

On December 12, 2023, Nurse O'Shea emailed Defendant Murphy a report of her evaluation of Plaintiff from December 6, 2023. *Id.* ¶ 60. Nurse O'Shea reported that at 7:20 a.m. on December 6, 2023, she was called to see a student in a room behind Commons 1. *Id.* ¶ 61. She wrote the following:

> Student was very dazed and sluggish appearing. Presented with dizziness. Pupils equal and reactive to light. [B]rought to clinic via wheelchair. Dried blood noted behind L ear. C/o Rt jaw pain, has rt shoulder pain with limited ROM without pain. Student was seen for concussion and had plan in October.
>
> Parents were contacted by admin for parent pick up. Student stated he hit his head against the wall after being hit by another student and that there was no loss of consciousness.

*Id.* In her report, Nurse O'Shea also detailed the treatment she provided to Plaintiff on December 6, 2023:

> Treatment:
>
> ice to shoulder and law [sic]. Concussion screening completed.
>
> The student answering slowly, denies HA, was dizzy at first but by 7:50 was denying any more dizziness. Parents were given a copy of the concussion Screening form and an ace form and were taking him to the E.R.

*Id.* ¶ 62. Nurse O'Shea did not call 9-1-1. *Id.* ¶ 63.

While Plaintiff was being evaluated by Nurse O'Shea, Officer Fink went to the school security office where he interviewed students who witnessed the attack. *Id.* ¶ 64. One student showed Officer Fink a video he recorded of the fight. *Id.* ¶ 65. Officer Fink reported the video showed Plaintiff lying on the ground, not moving. *Id.* Officer Fink returned to the nurse's office where he obtained a written statement from Plaintiff at 8:12 a.m. *Id.* ¶ 66.

At approximately 8:30 a.m., Plaintiff's parents arrived at Patriot High School. *Id.* ¶ 67. Waiting in the front office of Patriot High School, Plaintiff's parents overheard a school employee state that a parent called earlier to say the "fight" was going to happen. *Id.* ¶ 68. At approximately

8:31 a.m., Officer Fink met with Plaintiff's parents in the nurse's office. *Id.* ¶ 69. In Officer Fink's initial school report, he noted that he observed Plaintiff to have "noticeable redness, swelling, and contusions to his face and ear." *Id.* Officer Fink also stated that Nurse O'Shea had observed symptoms of a concussion. *Id.*

Approximately an hour and a half after the attack, Plaintiff's parents took Plaintiff to the UVA Prince William Emergency Department. *Id.* ¶¶ 70-71. At the Emergency Department, Plaintiff was treated for right shoulder pain, jaw pain, and dizziness. *Id.* ¶ 72. He was administered medications for pain and underwent a CT scan of sinus facial bones, head, and spine. *Id.* Medical staff also performed an x-ray of his right shoulder and elbow. *Id.* Plaintiff was diagnosed with a concussion. *Id.* On December 8, 2023, Plaintiff was seen by a physician at a pediatric provider. *Id.* ¶ 73. The examination notes indicate several visible lacerations around the head and ear and that Plaintiff continued to report pain in his neck, jaw, and shoulder. *Id.*

Treatment for Plaintiff's physical and emotional injuries required regular appointments with medical professionals for months after the assault. *Id.* ¶ 74. Plaintiff continues to experience pain and suffering from the injuries he sustained in the attack and will require medical treatment for the foreseeable future. *Id.* The concussion and mental health impact to Plaintiff significantly impaired his ability to perform academically. *Id.* ¶ 75. Plaintiff's injuries also impacted his ability to continue playing baseball, a sport he has loved since he was a young boy. *Id.* ¶ 76. Specifically, the shoulder injury resulted in Plaintiff no longer being able to throw the ball well, effectively ending his hopes of pitching in college one day. *Id.* At no time following the attack did any staff from Patriot High School or PWCPS contact Plaintiff or his parents to inquire about his condition or offer any support. *Id.* ¶ 77. Plaintiff was not able to return to school until January 15, 2024, at which time he was placed on Homebound instruction through February 26, 2024. *Id.* ¶ 78.

B.  Procedural Background

On January 8, 2025, Plaintiff filed his Complaint in this action alleging two substantive due process claims under 42 U.S.C. § 1983 against the School Board (Counts I and II), a gross negligence claim against Nurse O'Shea (Count III), and a gross negligence claim against Defendant Murphy (Count IV).  Dkt. 6 ¶¶ 96-130.  On February 6, 2025, Defendant Murphy filed a Motion to Dismiss the claim against him.  Dkt. 7.  On March 14, 2025, Plaintiff filed an Opposition.  Dkt. 18.  On March 17, 2025, Defendant Murphy filed a Reply.  Dkt. 19.

On March 28, 2025, Defendants PWCSB and O'Shea filed their Motion to Dismiss.  Dkt. 20.  On April 11, 2025, Plaintiff filed his Opposition.  Dkt. 24.  On April 17, Defendants PWCSB and O'Shea filed their Reply.  Dkt. 25.

On September 25, 2025, this Court issued a Memorandum Opinion and Order denying Defendant Murphy's Motion to Dismiss, finding that Plaintiff had sufficiently pleaded facts supporting a legal duty and gross negligence.  Dkt. 26.  The Court now addresses Defendants' PWCSB and O'Shea's Motion.

## II.  LEGAL STANDARD

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)

(citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

### III.  ANALYSIS

In their Motion, Defendants PWCSB and O'Shea argue that Plaintiff's claims against them fail as a matter of law because (1) Plaintiff does not state a substantive due process claim against the School Board under the state-created danger doctrine (Counts 1 and 2); (2) Plaintiff does not plausibly allege that the School Board deprived him of a property interest (Count 2); and (3) Nurse O'Shea exercised some degree of care and thus Plaintiff has failed to state a claim of gross negligence against her (Count 3). Dkt. 21. Because the Court finds that Plaintiff has failed to state a claim under the state-created danger doctrine against the School Board and failed to state a claim of gross negligence against Nurse O'Shea, the Court does not reach the remaining arguments.

#### A.  Counts 1 and 2: Substantive Due Process – School Board

Plaintiff asserts two substantive due process claims against the School Board for deprivations of his liberty interest in bodily integrity (Count 1) and his property interest in public education (Count 2). Dkt. 6 ¶¶ 98, 108. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978),

9

suits against a municipality for a federal constitutional deprivation are only permitted when the municipality undertook the allegedly unconstitutional action pursuant to an "official policy" or "custom." *Id.* at 690-91. "For the purpose of determining liability under *Monell*, local school boards in Virginia are treated as municipalities." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532 (4th Cir. 2022). The Fourth Circuit has held that *Monell* liability arises only in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (cleaned up).

As a general rule, "the Due Process Clause of the Fourteenth Amendment does not require governmental actors to affirmatively protect life, liberty, or property against intrusion by private third parties." *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995). There is an exception where "the state affirmatively acts to create or increase the risk that resulted in the victim's injury." *Graves v. Lioi*, 930 F.3d 307, 319 (4th Cir. 2019). In order for this state-created danger exception to apply, however, "[i]t is not enough to reframe a failure to protect against a danger into an affirmative act." *Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142, 147-48 (4th Cir. 2021). Indeed, the Fourth Circuit has held that "[i]t cannot be that the state 'commits an affirmative act' or 'creates a danger' every time it does anything that makes injury at the hands of a third party more likely." *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995).

Here, Plaintiff's state-created danger claims center on a series of alleged choices or inactions by the School Board which are far removed from the other students' attack on Plaintiff.[4] Specifically, Plaintiff points to the School Board's decision to approve the installation of weapons detectors and subsequent failure to provide additional staffing to "effectively" man all of the stations while adequately responding to incidents as affirmative acts.[5] Importantly, Plaintiff does not actually allege that there was inadequate staffing on the day in question. Rather, Plaintiff alleges that Defendant Murphy made a decision. Dkt. 6 ¶ 30 ("Defendant Murphy responded that he would find the student after the first class started since all the students were entering the building at that time through the EVOLV systems."). Plaintiff's allegation in this regard does not include any information suggesting that there was a staffing shortage or that staffing was inadequate. And Plaintiff only tangentially connects that decision to the EVOLV systems to the extent they were part of the entry to the school. In the main, Plaintiff simply asserts that Murphy made a decision

---

[4] Plaintiff's argument that the School Board was responsible for assigning Plaintiff to Commons 1 is not supported by facts alleged in the Complaint. And Plaintiff's argument that the School Board was responsible for Defendant Murphy's alleged inaction for fifteen minutes upon notification by the father of Student A cannot pass *Monell* as alleged. Accordingly, neither argument is well-taken.

[5] In his Opposition, Plaintiff asserts that Principal Bishop "specifically identified the increased risk to student safety levels" to Associate Superintendent for High Schools Hood. Dkt. 24 at 10. But, as quoted by Plaintiff in his Complaint and again in his Opposition, the cited email states as follows: "Still the same thing we talked about earlier- if staff are absent or there is an issue inside of the building that station cannot be manned or staffed effectively. I had trouble filling my spots up until the day before we went live. Still an issue." Dkt. 6 ¶ 20. In other words, Principal Bishop's text thread is reasonably read as expressing that the school would not compromise having sufficient staff available to respond to incidents within the building in order to run all of the weapons detector stations. Moreover, Plaintiff does not allege that any of the concerns raised by Principal Bishop (such as absences or short staffing) actually occurred on the day in question. Accordingly, the factual basis for Plaintiff's assertion that the School Board was on notice of the potential for safety incidents is also lacking.

11

based on when the students were entering the building. This does not reflect a policy or custom of the School Board.

The alleged causal connection between the decision to approve the installation of weapons detectors and the students' attack on Plaintiff is indirect at best in establishing any liability, and the Fourth Circuit has rejected claims with a significantly closer connection than the one alleged here. For example, in *Burns-Fisher v. Romero-Lehrer*, the Fourth Circuit held that the principal's "knowledge of [a student's] prior acts of violence and creation of the staffing schedule which required [the plaintiff] to teach [the student] on the day of the incident – without a second teacher in her classroom [per board of education policy]" were insufficient for the state-created danger exception because the conduct "did not directly cause [the plaintiff's] injuries." 57 F.4th 421, 425 (4th Cir. 2023). Here too, the School Board's decision to approve the installation of weapons detection systems did not directly cause Plaintiff's injuries—his fellow students did. Accordingly, Plaintiff has failed to plausibly allege that the state-created danger exception applies, and his claims against the School Board will be dismissed.

### C. Count 3: Gross Negligence – Nurse O'Shea

"The gross negligence standard is higher than the general negligence standard." *B.R. v. F.C.S.B.*, 2023 WL 2464975, at *22 (E.D. Va. Mar. 10, 2023). "Gross negligence is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d. 730, 732 (Va. 2016). To prevail on such a claim, Plaintiff must show "a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." *Id.* At this stage, a court asks whether "reasonable minds [could] differ as to whether the defendant[s] acted in a grossly negligent manner." *Kabana v. United States*, 2022 WL 989014, at *5 (E.D. Va.

12

Mar. 31, 2022). "Whether or not gross negligence has been proved depends on the facts and circumstances of each case, and it is often a difficult task to determine whether the facts and reasonable inferences therefrom in a given case do or do not show gross negligence as a matter of law." *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 574 (E.D. Va. 2020) (cleaned up) (quoting *Walloer v. Martin*, 144 S.E.2d 289, 292 (Va. 1965)). "As a result, courts frequently deny motions to dismiss gross negligence claims as premature without the benefit of fact discovery." *B.R.*, 2023 WL 2464975, at *22 (collecting cases).

    Here, Nurse O'Shea brought Plaintiff to her office in a wheelchair, Dkt. 6 ¶¶ 55, 56, 61; assessed Plaintiff, including for a concussion, *id.* ¶ 61; recorded her findings about his physical appearance and his reports that he did not lose consciousness and that his dizziness had passed, *id.*; treated Plaintiff with ice for his shoulder and jaw, *id.* ¶ 62; and provided a copy of the concussion screening form and an ace form to Plaintiff's parents who arrived just over an hour later and who indicated that they were taking him to the emergency room, *id.* ¶ 62. Although Plaintiff argues that Nurse O'Shea should have immediately called for an ambulance (despite his own declination of Officer Fink's offer to do so in Nurse O'Shea's presence), it cannot be reasonably disputed that Nurse O'Shea exercised "some degree of care" in assessing and treating Plaintiff. *Elliot*, 791 S.E.2d at 732; *see also Williams v. Kincaid*, 45 F.4th 759, 776-77 (4th Cir. 2022) ("Because merely inadequate care is insufficient to make out a claim of gross negligence, such a claim 'must fail as a matter of law when the evidence shows that the defendants exercised some degree of care.'" (quoting *Elliot*, 791 S.E.2d at 732)). Moreover, Plaintiff does not plausibly allege that Nurse O'Shea's failure to immediately contact emergency services caused or exacerbated his injuries. Accordingly, Count 3 will be dismissed, and Nurse O'Shea will be terminated as a defendant in this action.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

ORDERED that Defendants PWCSB and O'Shea's Motion to Dismiss (Dkt. 20) is GRANTED; and it is

FURTHER ORDERED that Counts 1, 2, and 3 of the Complaint are DISMISSED; and it is

FURTHER ORDERED that Defendants PWCSB and O'Shea are TERMINATED as defendants in this action; and it is

FURTHER ORDERED that a scheduling order will issue promptly with respect to the remaining claim against Defendant Murphy.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
March 12, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge